UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

04 AUG -5 AM 10: 35

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| JERRY STATEN, *et al.*        ) | |
|                ) | |
|      **Plaintiffs,**      ) | |
|                ) | |
| **vs.**               ) | **Civil Action No. CV-04-S-829-NE** |
|                ) | |
| **GOLD KIST, INC.**      ) | |
|                ) | |
|      **Defendant.**      ) | |
|                ) | |
|                ) | |

## MEMORANDUM OPINION

This action is before the court on defendant's motion to compel arbitration of the claims of two plaintiffs in this case—Lavonndra Diamond and Larry Havis ("plaintiffs")—and to either dismiss or stay the proceedings accordingly.[1] In seeking an order compelling these parties to arbitrate, defendant relies on a form arbitration agreement signed by plaintiffs as a condition of their employment with defendant.[2] Plaintiffs contest the enforceability of the agreement on several grounds. For the reasons discussed below, defendant's motion to compel arbitration must be granted.

---

[1]Doc. no.6 (Motion to Compel Arbitration or Alternatively to Stay Action Pending Arbitration).

[2]*Id.*, Exhibits 1, 2. Though there are two agreements at issue, they are identical in form and substance.



## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are both employees of defendant at its Guntersville, Alabama location.[3] At the commencement of their employment,[4] each plaintiff herein signed a form arbitration agreement, which, in pertinent part, reads as follows:

> Unless specifically prohibited by law, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, or arising out of or relating to my employment or separation from employment by GOLD KIST, including claims against officers, directors, or employees of Gold Kist, shall be resolved by arbitration pursuant to the Federal Arbitration Act or applicable Georgia state law and the Employment Dispute Resolution Rules of the American Arbitration Association.[5]

On April 23, 2004, plaintiffs joined with three other employees in filing a complaint in this court alleging various infringements of their rights under 42 U.S.C. § 1981 and also asserting Alabama state law claims for outrage, negligent retention, and negligent supervision.[6] Defendant filed an answer[7] denying the allegations and subsequently moved to compel arbitration of the claims of these two plaintiffs

---

[3]*See* Doc. no. 14 (Second Amended Complaint).

[4]Plaintiff Diamond signed the agreement on May 8, 2002 (Doc. 6, Exhibit 1); Plaintiff Havis signed it on March 21, 2000 (Doc. no. 6, Exhibit 2).

[5]Doc. no. 6, Exhibits 1, 2 (caps in original).

[6]*See* Doc. no. 1 (Complaint). Plaintiffs filed two amended complaints (Docs. no. 2, 14). In the second amended complaint, plaintiff Lavonndra Diamond sought damages for a sexually hostile work environment pursuant to Title VII of the Civil Rights Act of 1964, and asserted another pendant state law claim for invasion of privacy. *See* Doc. no. 14.

[7]Doc. no. 4 (Answer).

pursuant to the arbitration agreement.[8]  In an affidavit attached to its motion to compel, defendant also stipulated that, should the court order arbitration, defendant would bear the full costs of the proceedings.[9]  Defendant reiterated this intention in its reply.[10]

## II. MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, establishes a federal policy favoring arbitration and a body of substantive law governing the area. *See, e.g., Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983) (holding that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). The FAA was enacted "to reverse the longstanding judicial hostility to arbitration agreements." *Gilmer/Interstate Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26 (1991).  To effect that purpose, section 4 of the FAA provides a procedure for compelling enforcement of arbitration agreements in cases where one party refuses to comply: an adverse party may petition any district court

---

[8]Doc. no. 6.

[9]*Id.*, Exhibit A (Declaration of Patrick W. Allen) at ¶ 5.  As discussed more fully below, this stipulation would negate a clause in the agreement that provides for the costs of the arbitration to be divided equally between the parties.

[10]*See* Doc. no. 12 (Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration).

having jurisdiction to order compliance, in which case the court must order arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4 (2004).

Not surprisingly, plaintiffs and defendant disagree as to whether the making of this particular agreement is "in issue." Plaintiffs argue that this court should not compel arbitration because the terms of the agreement are unconscionable and contrary to statutory policy.[11] Under the FAA, a written agreement to arbitrate a dispute that relates to a transaction involving interstate commerce is valid and enforceable in either state or federal court, "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2004). Thus, while federal law mandates enforcement of valid arbitration agreements, the formation, existence, and interpretation of a contract to arbitrate is governed by state law.[12] *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924,

---

[11]Plaintiffs' objections are targeted at two clauses of the agreement, a fee-splitting provision and a confidentiality clause. *See* Doc. no. 11 (Opposition to Defendant's Motion to Compel Arbitration). The fee-splitting provision reads as follows: "[t]he cost of the arbitrator shall be shared equally." The confidentiality clause provides that "[t]he parties agree that the existence, conduct, and content of any such arbitration proceeding shall be treated as confidential and shall not be disclosed by either party." Doc. no. 6, Exhibits 1,2.

[12]In this case, the state law to be applied is that of Georgia, even though the agreement was made in Alabama, due to the choice of law clause. That clause provides "[t]his Agreement shall be interpreted in accordance with the laws of the State of Georgia." Doc. no. 6, Exhibits 1,2. Alabama courts routinely enforce choice of law clauses so long as the result is not contrary to Alabama public policy. *See Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506-507 (Ala. 1991). Since the only state law at issue here is that of unconscionability, and since Georgia and Alabama precedent is largely analogous in this regard, the court sees no barrier to following  Georgia cases.

-4-

131 L. Ed. 2d 985 (1995).

Before reaching plaintiffs' contentions, it is important to note that there is no dispute as to the presence of the basic prerequisites for a valid arbitration agreement. Indeed, written agreements calling for arbitration and bearing the signatures of the parties clearly exist and have been presented to this court by both parties.[13] Further, plaintiffs' employment involves interstate commerce. The Supreme Court directed district courts to accord an expansive construction to the FAA's phrase "involving commerce." *See Allied-Bruce Terminix Cos.,Inc. v. Dobson*, 513 U.S. 265, 268, 115 S. Ct. 834, 836, 130 L. Ed. 2d 753 (1995). The Court has construed that language as being the functional equivalent of "affecting commerce": a phrase that "normally signals Congress' intent to exercise its Commerce Clause powers to the full." *Id.* at 273, 115 S. Ct. at 839. Defendant Gold Kist is a corporation that is engaged in the sale of chicken and chicken products throughout the United States, and it maintains poultry processing plants in various locations across the Southeast, including a facility in Guntersville.[14] Though the agreement at issue in this case is not itself commercial in nature, it involves employment related to interstate commerce, and thus falls within the purview of the FAA. *See Circuit City Stores, Inc. v. Adams*, 532

---

[13]Doc. no. 6, Exhibits 1, 2.

[14]*Id.*, Exhibit A, at ¶ 6.

U.S. 105, 113, 119, 121 S. Ct. 1302, 1308, 1311, 149 L. Ed. 2d 234 (2001).

Finally, the arbitration agreement applies to the claims at issue in this case. The agreement broadly binds plaintiffs to arbitration of "any controversy or  claim arising out of or relating to . . . [plaintiffs'] employment or separation from employment by GOLD KIST, including claims against officers, directors or employees of Gold Kist."[15] Both plaintiffs allege workplace racial discrimination, as well as state law negligence claims based on their employer's failure to correct the alleged abuses.[16] In addition, plaintiff Lavonndra Diamond alleges she was subjected to a sexually hostile work environment and experienced invasions of privacy.[17] The relation of these claims to plaintiffs' employment is self-evident—underlying each cause of action is a complaint about conditions at the workplace.  Employment disputes arising under state law and under civil rights statutes such as Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 can be, and often are, submitted to arbitration under the FAA.  *See, e.g., Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255 (11th Cir. 2003) (Title VII); *Peterson v. BMI Refractories*, 132 F.3d 1405, 1412 n.13 (11th Cir. 1998) (§ 1981); *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 700 (11th Cir. 1992) (state law claims and Title VII); *Wright v. Circuit City*

---

[15]Doc. no. 6, Exhibits 1, 2 (caps in original).

[16]Doc. no. 14.

[17]*Id.*

*Stores, Inc.*, 82 F. Supp. 2d 1279, 1282 (N.D. Ala. 2000) (Title VII and § 1981).

Ordinarily, these circumstances would be sufficient to require the court to submit this matter to arbitration of any and all disputes.  As mentioned above, however, plaintiffs contest the enforceability of the arbitration agreement.  Although counsel on both sides address the argument as one grounded on the state-based doctrine of unconscionability, plaintiffs actually raise two distinct objections to enforcement of this agreement.  Plaintiffs initially contend that the confidentiality clause and the fee-splitting provision combine to render the agreement unconscionable under Georgia law.  In an attempt to buttress this unconscionability argument, plaintiffs point to a line of federal cases addressing the enforceability of arbitration agreements which contain terms allegedly limiting the ability of signatories to effectively vindicate their federal statutory rights.  While these arguments do overlap to a certain degree, they are conceptually distinct, involving different policies and different precedent.  Therefore, in order to rule with precision on the issues presented, the court will address the arguments separately below.

## A.    Effective Vindication of Federal Statutory Rights

Plaintiffs argue that the fee-splitting provision in the agreement at issue is unenforceable under a policy-based defense to arbitration of federal statutory claims available when the costs of arbitration would deprive a litigant of a meaningful

chance to obtain relief. This defense is of a limited nature, reserved for the most serious scenarios involving oppressive arbitration agreements. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637, 105 S. Ct. 3346, 3359, 87 L. Ed. 2d 444 (1985) (holding that "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum," an arbitration agreement is enforceable ); *see also Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 90, 121 S. Ct. 513, 521, 148 L. Ed. 2d 373 (2000) (same). Moreover, sweeping attacks on arbitration grounded in unsubstantiated fears that arbitration is somehow inherently unfair are not to be entertained. *Green Tree*, 531 U.S. at 89, 121 S. Ct. at 520 (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481, 109 S. Ct. 1917, 1920, 104 L. Ed. 2d 526 (1989)).

Plaintiffs, however, have not endeavored to launch a generalized attack, but have asserted that the terms of this particular agreement—specifically the fee-splitting provision and confidentiality clause—preclude effective vindication of their statutory rights. The Supreme Court recently acknowledged the *possibility* that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights." *Green Tree*, 531 U.S. at 90, 121 S. Ct. at 521; *see also Anders v. Hometown Mortgage Serv., Inc.*, 346 F.3d 1024, 1028 (11th Cir. 2003). Similarly, the Supreme Court has heard, but ultimately rejected,

challenges to the limits placed on discovery in the arbitral forum. *See Gilmer*, 500 U.S. at 33, 34, 111 S. Ct. at 1656. In all of these challenges, the party seeking to avoid arbitration bears the burden of showing that adjudication in such a forum would mean the   denial of an opportunity to effectively vindicate statutory rights. *See Anders*, 346 F.3d at 1028 ("where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs") (quoting *Green Tree*, 531 U.S. at 92, 121 S. Ct. at 522); *see also Gilmer*, 500 U.S. at 26, 29, 111 S. Ct. at 1655 (noting that the challenger bears the burden of proving the inadequacy of discovery procedures).

These plaintiffs, like so many others attempting to make these arguments, have failed to meet the burdens assigned to them. On the issue of costs, the rules cited above clearly indicate that courts should undertake a case-by-case inquiry in order to determine whether, under the circumstances of the case at hand, the aggrieved party would actually be deprived of some rights as a result of arbitration expenses. *See, e.g., Musnick*, 325 F.3d at 1259 (collecting cases). Here, rather than presenting evidence to show the probability that they will incur exorbitant costs,[18] plaintiffs rely

---

[18]Plaintiffs do request, in the alternative, that this court grant them a period of limited discovery so that they can better assess the likelihood of incurring such expenses. *See* Doc. no. 11. As will be discussed below, discovery on this issue, while perhaps appropriate in certain circumstances, would be pointless here, where defendant has agreed to pay the entire price of

on *Cole v. Burns Int'l Sec. Serv.*, 105 F.3d 1465 (D.C. Cir. 1997), in which the Court of Appeals for the District of Columbia Circuit adopted a *per se* rule against fee-splitting in arbitration agreements signed by employees as a condition of their employment. This court need not analyze the reasoning applied in that case, because the courts in the Eleventh Circuit have repeatedly rejected such a rule. *See, e.g., Musnick*, 325 F.3d at 1259 (holding that, "[a]fter *Green Tree*, an arbitration agreement is not unenforceable merely because it may involve some "'fee-shifting'"); *see also Boyd v. Town of Hayneville, Alabama*, 144 F. Supp. 2d 1272, 1280 (M.D. Ala. 2001) (refusing to adopt a *per se* rule against fee-splitting).

In light of the unequivocal precedent in this Circuit, it was up to plaintiffs to present some evidence indicating that they would encounter unbearable fees. To this date, all that has been presented to the court in this regard is a copy of the American Arbitration Association's Rules for the Resolution of Employment Disputes ("AAA Rules" or "Rules"), which detail the filing fees and other expenses that might be associated with resolution of this case.[19]  What the Rules do not do is apprise the court of plaintiffs' financial situation or their ability to pay their share of the costs of

---

arbitration. *See Anders*, 346 F.3d at 1029.

> [19]These rules are to govern the arbitral adjudication, in accordance with the clause to that effect in the parties' agreement. As defendant points out, AAA Rule 38 provides for a reduction or deferral of the administrative costs in the event of extreme hardship. *See* Doc. no. 12, at 7. This provision alone may be sufficient to defeat plaintiffs' argument against fee-splitting, but the court finds it unnecessary to decide the case on that ground. *See Anders*, 346 F.3d at 1028-1029.

arbitral proceedings. In the absence of some documentation of plaintiffs' financial situation, "the Court simply cannot assume Plaintiff's inability to pay these fees." *Landers v. Crown Pontiac, Inc.*, 2001 WL 1867812, at *2 (N.D. Ala., May 30, 2001).

But even if the court were to assume *arguendo* that the fees are excessive, and that plaintiffs are unable to pay, there are countervailing considerations negating any argument that the fee-splitting provision renders the agreement unenforceable. Defendant has stipulated that it will pay all costs of any arbitration proceedings.[20] The Eleventh Circuit addressed this exact scenario just last year in *Anders v. Hometown Mortgage Serv., Inc.*, 346 F.3d 1024 (11th Cir. 2003),[21] and held that "any problem involving whether the plaintiff can afford the cost of arbitration is no problem in light of defendant's stipulation to pay the plaintiff's costs." *Id.* at 1026. In *Anders*, the plaintiff filed a complaint alleging violations of several federal statutes, and the defendant responded by moving the district court to compel arbitration pursuant to an agreement signed by the plaintiff. *Id.* at 1027. The plaintiff argued that the agreement was unenforceable because the AAA Rules governing the

---

[20]Doc. no. 6, Exhibit A, at ¶ 5.

[21]The court notes that plaintiffs' counsel conspicuously neglected to direct the court's attention to this binding precedent dealing with an eerily similar fact pattern. The court can only hope that this omission was due to an innocent oversight. Counsel is further advised to cite *Paladino v. Avnet Computer Tech., Inc.*, 134 F.3d 1054 (11th Cir. 1998) cautiously in light of the *Green Tree* decision. *See Anders*, 346 F.3d at 1031 (expressing disapproval of *Paladino* and declining to extend); *see also Roberson v. Clear Channel Broad., Inc.*, 144 F. Supp. 2d 1371, 1374 n. 2 (S.D. Fla. 2001) (acknowledging questionable nature of *Paladino*).

arbitration mandated that the costs of the proceedings be borne equally by the parties.[22] *Id.* at 1028. In response to this argument and the plaintiff's submissions attesting to his inability to afford arbitration, the defendant stipulated that it would bear the costs of arbitration necessary "'to make it fair for Mr. Anders.'" *Id.* at 1029 (quoting defendant's counsel at oral argument). In light of this stipulation, the court concluded that, "[g]iven [the defendant's] willingness to bear the costs of arbitration that Anders is unable to afford . . . it follows that Anders has not demonstrated that arbitration would be prohibitively expensive for him." *Id.*

As in *Anders*, in the instant case application of the appropriate AAA Rules would result in fee-splitting between plaintiffs and defendant *but for* defendant's promise to assume the costs of arbitration.[23] In fact, the case for compelling arbitration is even stronger here, because unlike the facts in *Anders*, where the defendant's stipulation only obligated it to pay whatever portion of costs that the arbitrator ultimately assessed, Gold Kist has agreed unreservedly to "pay all costs

---

[22]The AAA's Commercial Rules governed that dispute. In contrast, under the Rules for the Resolution for Employment Disputes that are applicable in this case, "all expenses of the arbitration . . . shall be borne by the employer, unless the parties agree otherwise or unless the arbitrator directs otherwise . . . ." *See* Doc. no. 12, at 5.

[23]To be clear, these promises do not cure any alleged invalidity, but instead serve to render the issue moot. *See Roberson*, 144 F. Supp. 2d at 1373-1374 (holding that, while the plaintiff may have demonstrated that she was unable to afford her share of the costs of arbitration, the defendant's stipulation that it would bear the full costs notwithstanding the terms of the agreement made the plaintiff's financial status irrelevant).

associated with . . . arbitration proceedings," without deferring to the arbitrator's judgment.[24] Honoring this stipulation will preclude the possibility of the arbitrator adjusting the fees at a later date and, thus, will ensure plaintiffs' ability to vindicate their rights without incurring arbitration expenses. Moreover, in the unlikely event that defendant falters on its promise and plaintiffs are assessed with unbearable costs, judicial review would be available. *See First Options of Chicago, Inc.*, 514 U.S. at 942, 115 S. Ct. at 1923 (noting that arbitration awards may be modified or overruled if they are in "manifest disregard of the law") (internal quotations and citations omitted); *see also Musnick*, 325 F.3d at 1261 (compelling arbitration despite "loser pays" provision in agreement but noting that "[i]f [the plaintiff] believes that liability is excessive or that it deprives him of his statutory remedy, he may seek judicial review").

Having decided the fee-splitting issue against plaintiffs, there remains the dispute over the confidentiality clause. The clause reads in full as follows: "[t]he parties agree that the existence, conduct, and content of any such arbitration proceeding shall be treated as confidential and shall not be disclosed by either party."[25] In brief, the argument is that the confidentiality clause is unenforceable

---

[24]Doc. no. 6, Exhibit A, at ¶ 5.
[25]Doc. no. 6, Exhibits 1, 2.

-13-

because, under plaintiffs' interpretation, it "prohibits plaintiffs from conducting even minimal discovery."[26]   Although this argument is again dressed in the clothes of unconscionability, many of the cases cited concern the same policy-based defense deemed inapplicable above.

Preliminarily, it is worth noting that, regardless of the merits of plaintiffs' argument, the document at issue contains a severability clause which provides, "[i]f any part of this Agreement is held void, voidable, or otherwise unenforceable by any court or arbitrator, nothing contained herein shall limit the enforceability of any other part."[27]   In light of this forgiving provision, even if the discovery provision is due to be removed, arbitration is inevitable. *See, e.g., Primerica Fin. Serv., Inc. v. Wise*, 456 S.E. 2d 631 (Ga. App. 1995) (affirming trial court's "blue penciling" and subsequent enforcement of an arbitration clause pursuant to a severability provision in the arbitration agreement).   However, because a reasonable interpretation of the agreement reveals no conflicts with federal policy, severance will not be necessary to avoid invalidity.

Plaintiffs have not cited, and the court has not been able to locate, any cases wherein a confidentiality clause was interpreted to limit the scope of discovery in an

---

[26]Doc. no. 11, at 2-4.

[27]Doc. no. 6, Exhibits 1, 2.

arbitration proceeding. Nonetheless, the language of this provision does create an ambiguity that requires interpretation. In expounding the agreement, the court is cognizant of the widely accepted rule, applied in Georgia as well as in other states, that when courts interpret contracts, the intentions of the parties are consulted first and govern above all else. *See* Ga. Code Ann. § 13-2-3 (2003) (providing that "[t]he cardinal rule of construction is to ascertain the intentions of the parties"); *see also Schwartz v. Schwartz*, 561 S.E. 2d 96, 97 (Ga. 2002). Thus, where two or more meanings are plausible, and the intentions of the parties can be ascertained, the courts should give effect to that meaning which most accurately reflects the intent of the parties. *Schaffer v. City of Marietta*, 469 S.E. 2d 479, 481 (Ga. App. 1996).

Here, the circumstances and language of the agreement indicate that the confidentiality clause was intended not as a device to contravene discovery, but as a bulwark against negative publicity. The arbitration agreement was signed by plaintiffs as a condition of their employment with Gold Kist. Gold Kist is a large corporation which undoubtedly defends employment-related lawsuits on a regular basis. By including in the mandatory arbitration agreement a clause limiting the extent to which the conduct of any lawsuit against it may be made public, the company protects its image from public scorn. Likewise, a confidentiality provision protects employees in the event that the table is turned. To interpret this

clause—which by its very terms makes no allusion to or mention of discovery—as limiting the scope of the arbitration to the unsupportable and unverifiable contentions of the parties, without the assistance of any evidence obtained through discovery, would be to effect an absurd result. *See Whitney v. Hagan*, 16 S.E. 2d 779, 781 (Ga. App. 1941) (noting that all contracts are due a "fair and reasonable construction"). Such an interpretation would not only limit plaintiffs' ability to procure evidence to substantiate their claims, but it would also preclude defendant from soliciting testimony in its own defense. Accordingly, the court finds no merit in the argument that the clause impermissibly restricts discovery because there is no evidence that the parties ever intended such a result.

But even if plaintiffs' somewhat strained interpretation of the confidentiality clause is accurate, the court is satisfied that the AAA Rules governing this dispute will provide plaintiffs with discovery sufficient to vindicate their statutory rights. Rule 7 of the AAA Rules applicable here provides that "[t]he arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration."[28] Rule 18 mandates that "[t]he arbitrator shall maintain the

---

[28]Doc. no. 11, Exhibit 2, at 9.

-16-

confidentiality of the arbitration and shall have the authority to make appropriate rulings to safeguard that confidentiality, unless the parties agree otherwise or the law provides to the contrary."[29]   The existence of these two rules shows that confidentiality and limited discovery are not mutually exclusive in fact or in the eyes of the AAA.  To the extent that plaintiffs might claim that the terms of the agreement supercede these rules, that argument fails in light of AAA Rule 1, which states that "[i]f a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules."[30] Therefore, under the AAA Rules, an arbitrator would have the discretionary power to order discovery regardless of the terms of the arbitration agreement.  "Although those procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" *Gilmer*, 500 U.S. at 33, 111 S. Ct. at 1655 (quoting *Mitsubishi*, 473 U.S. at 628, 105 S. Ct. at 3354).  In light of these considerations, the court finds the confidentiality clause not to be a barrier to compelling arbitration.

**B.    Unconscionability**

---

[29]*Id.* at 13.

[30]*Id.* at 7.

Plaintiffs also argue that the fee-splitting provision and confidentiality clause discussed above combine to render the arbitration agreement unconscionable and void under Georgia law.   Initially, plaintiffs cite Ga. Code Ann. § 11-2-302 as authority for the proposition that Georgia recognizes the unconscionability defense.[31] "Technically, reliance on this code section in this case is . . . misplaced [because] the scope of Article 2 is limited to 'transactions in goods.'" *Garbutt v. Southern Clays, Inc.*, 894 F. Supp. 456, 463 (M.D. Ga. 1995).   But, "[i]n any event, the court does not perceive in Georgia law a noticeable difference in the standards and procedures for unconscionability in and out of the Article 2 context." *Id.*   Under either Article 2 or Georgia common law, "'[a]n unconscionable contract is one abhorrent to good morals and conscience.   It is one where one of the parties takes a fraudulent advantage of another.'" *Results Oriented v. Crawford*, 538 S.E. 2d 73, 80 (Ga. App. 2000) (quoting *F.N. Roberts Pest Control Co. v. McDonald*, 208 S.E. 2d 13 (Ga. App. 1974)), *aff'd*, 548 S.E. 2d 342 (Ga. 2001).   "'It is an agreement that no sane person not acting under a delusion would make and that no honest person would take advantage of.'" *Id.* (quoting *W.J. Cooney, P.C. v. Rowland*, 524 S.E. 2d 730 (Ga. App. 1999)).   Though there is no strict formula, the Georgia Supreme Court has indicated that the majority of contracts properly found to be unconscionable will be tainted by the presence of

---

[31]Doc. no. 11, at 2.

both procedural and substantive elements of unconscionability. *See NEC Tech., Inc. v. Nelson*, 478 S.E. 2d 769, 771-772 (Ga. 1996).

Plaintiffs first contend that the confidentiality clause unfairly limits their right to obtain discovery and thus renders the agreement procedurally unconscionable. This argument is based on an erroneous understanding of the procedural element. "Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves." *NEC Tech.*, 478 S.E.2d at 771. Here, plaintiffs do not allege that they were tricked or coerced into signing the agreement or that the language was so confusing or disguised that they could not understand it. In fact, the agreement is only one page long, printed in medium-sized type, with the terms separated in bulleted paragraphs for ease of reading. While plaintiffs were required to consent to the agreement as a condition of their employment, there is nothing in the record to suggest that they were denied the opportunity to confer with legal counsel prior to signing. Nor do plaintiffs claim that they were unable to negotiate the terms of the agreement, or to ask questions about it. The clear implication, in the absence of any contrary evidence, is that plaintiffs willingly and without objection placed their signatures on the form. These facts are plainly insufficient to support a finding of procedural unconscionability. It may well be that the absence of procedural unconscionability makes discussion of the

substantive element superfluous, but the Georgia Supreme Court has not squarely taken a position on this matter, so the court will address both prongs of the unconscionability analysis. *See NEC Tech.*, 478 S.E.2d at 773 (noting the majority rule, but declining to rule on the issue under the facts presented).

Plaintiffs' complaints concerning the alleged oppressiveness of the confidentiality clause are more properly considered in the context of substantive unconscionability, but in this case need not be considered at all. As discussed above, plaintiffs' interpretation of that clause is unconvincing, and plaintiffs themselves do not contend that a mere confidentiality requirement, standing alone, would warrant a finding of unconscionability. The court rests its decision on the fact that such an interpretation is not in accord with the intentions of the parties, and declines to speculate on the possibility of finding unconscionability in a case where the agreement does present a bona fide limit on discovery.

Without the discovery argument, plaintiffs' only remaining theory is that the fee-splitting provision is alone enough to void the agreement.[32] In deciding whether

[32]This argument is not preempted by the fact that defendant has agreed to pay the costs of arbitration because the unconscionability analysis, unlike that required for the *Green Tree* issue, is focused on the circumstances existing at the time when the contract was formed; neither subsequently-acquired knowledge nor later developing facts are relevant to the determination. *See Results Oriented*, 538 S.E. 2d at 79. Though this would at first blush seem to be a helpful distinction from plaintiffs' perspective, the Georgia courts have interpreted the prohibition on subsequently acquired knowledge in a way that actually seems to defeat plaintiffs' argument. In *Results Oriented*, the Georgia Court of Appeals held that the high costs of arbitration were irrelevant to determining unconscionability because there was no evidence that the aggrieved party, at the time of the

a provision is substantively unconscionable, Georgia courts have "focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *NEC Tech.*, 478 S.E.2d at 772. While the commercial reasonableness consideration has only minimal relevance in this setting, a review of the cases in the area reveals that fee-splitting clauses are certainly not unheard of in employment arbitration agreements, and the vast majority of courts have refused to declare them *per se* invalid. *See, e.g., Anders*, 346 F.3d 1024; *Musnick*, 325 F.3d 1255; *Boyd*, 144 F. Supp. 2d 1272. Such an arrangement makes good sense, as employers are often subjected to lawsuits at their employees' behest, and arbitration, though occasionally more expensive, best serves the interests of efficiency and conservation of resources. A fee-splitting requirement serves at least two legitimate purposes: dividing the slightly higher costs of a more efficient forum in an equitable manner, and discouraging frivolous lawsuits by both parties. In light of these considerations, the court can hardly declare as a matter of law that such an arrangement is "abhorrent to good morals and conscience." *Results Oriented*, 538 S.E.2d at 80 (internal quotations and citations omitted).

---

formation of the agreement, had any knowledge of higher prices involved in arbitrating a claim as opposed to litigating it in court. *Id.* at 79-80. That decision was later affirmed by the Georgia Supreme Court, 548 S.E.2d 342. Though this court expresses no opinion as to whether such an interpretation is correct, it does note that if it is, the facts of this case support the same conclusion.

In *NEC Tech., Inc. v. Nelson*, 478 S.E. 2d 769 (Ga. 1996), the Georgia Supreme Court reached an analogous conclusion concerning the permissibility of risk reallocation in the context of a breach of warranty case.  In that case the plaintiffs brought suit against the manufacturer of their television after suffering property damage from a fire which they alleged was caused by a defect with the television. *Id.* at 770.  The defendant moved for partial summary judgment on the plaintiffs' consequential damages claim on the ground that the express warranty excluded such damages. *Id.*  The plaintiff countered by arguing that such a limitation was unconscionable. *Id.* In siding with the defendant and refusing the unconscionability argument, the court held:

> A warranty that limited the consumer's remedy to the replacement of parts, labor, services, and perhaps the value of the television set itself was not unreasonable as a matter of law in light of the remote, albeit dire, possibility that a defect might be present in the television set and that the consequences of the defect might be a fire that could extend beyond the set itself. . . . [W]e cannot conclude under the circumstances in this case that the allocation of the risk of property damage to the Nelsons was unconscionable.

478 S.E.2d at 774.  Here, as in *NEC Tech.*, the contested term merely serves to reallocate a risk once borne by a single party equally between two.  In that case the risk was liability for damages from a fire; here the risk was liability for legal costs arising out of a potential employment dispute.  Thus, Gold Kist, by mandating that

-22-

plaintiffs sign an arbitration agreement under which the costs of any possible dispute resolution will be shared equally, has, for legitimate and understandable reasons reallocated the risk of incurring an expense in a manner that attempts to ensure that neither party to a lawsuit is saddled with prohibitive costs. This situation, then, does not involve "enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice." *Id.* at 774 (internal quotations and citations omitted).

## IV. CONCLUSION

For the foregoing reasons, defendant's motion to compel arbitration is due to be granted. The claims of Diamond and Havis will be stayed in accordance with the terms of the order entered contemporaneously herewith. As discussed above, and without holding that such a modification is necessary to render the agreement enforceable, the court will order defendant to pay all costs and fees associated with the arbitration in accordance with defendant's stipulation to that effect.

DONE this _5th_ day of August, 2004.

United States District Judge

-23-